## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

_____

PEARL J. FIEDOR,

              Plaintiff,


v.                          **MEMORANDUM OF LAW & ORDER**
                                  Civil File No. 05-2065 (MJD/JJG)


QWEST DISABILITY PLAN and
QWEST COMMUNICATIONS
INTERNATIONAL, INC.,

              Defendants.

_____

I. Chris Ritts and John C. Dunlap, Dunlap & Ritts, PA, Counsel for Plaintiff.

Bradley J. Lindeman, Meagher & Geer, PLLP; Donald W. Heyrich, Law Office of Donald W. Heyrich PLLC; and Thomas M. Affolter, Perkins Coie, Counsel for Defendants.

_____

## I.    INTRODUCTION

This matter is before the Court on Defendants' Motion for Summary Judgment [Docket No. 16] and Plaintiff's Motion for Summary Judgment [Docket No. 19]. The Court heard oral argument on April 25, 2007.

## II.    BACKGROUND

### A.    Factual Background

#### 1.    The Parties

Plaintiff Pearl Fiedor was employed at Defendant Qwest Communications International, Inc. ("Qwest") as a sales and service consultant from March 30, 1998 until January 14, 2005.  (Administrative Record ("A.R.") Q0079.)  Her job primarily involved telephone sales, which required her to sit for prolonged periods of time connected to a telephone and a computer.  (Id. Q0116.)  Qwest classified her position as "sedentary."  (Id. Q0079.)

### 2.    The Plan

At the times relevant to this lawsuit, Fiedor was covered by Defendant Qwest Disability Plan ("Plan").  (A.R. Q0296-361.)  The Plan is a self-funded employee welfare benefit plan that provides both short-term and long-term disability benefits.  Qwest is the plan sponsor and the plan administrator.  (Id. Q0357.)

Under the Plan, eligible employees can obtain short-term disability benefits for up to fifty-two or seventy-eight weeks.  (A.R. Q0318.)  Participants must exhaust their short-term disability benefits before they are eligible for long-term disability benefits.  (Id.)

In order to qualify for short-term disability benefits, a participant must first be disabled.  "Disability" means

> an illness or injury, supported by objective medical documentation, that prevents you from performing the normal job duties of your regular job or any other job to which you may be assigned (with or without modification).

2

(A.R. Q0337.)

Additionally, the participant must notify health services of her absence, seek proper care and treatment in a timely manner from an approved provider, follow a recommended treatment plan, and provide documentation supporting total disability within a reasonable period not to exceed three weeks from the first day of absence. (A.R. Q0307-08.) Specifically, a participant must

> [p]rovide documentation supporting total Disability (or Disability requiring reduced hours) to Health Services within a reasonable period not to exceed three weeks from the first day of absence, and after each follow-up visit with a Provider (or as often as requested by Health Services). Documentation must be from the original dated medical record and support the claim of total Disability (or partial Disability requiring reduced hours, if appropriate). Such documentation shall include: the patient's subjective complaints or "story of illness"; the objective, measurable, or reproducible findings from physical examination and supporting laboratory or diagnostic tests; assessment or diagnostic formulation; and a plan for treatment or management of the problem. The documentation must be legible and sufficient to allow another trained medical professional to review the case, and see how the original Provider came to his determination and decisions.

(A.R. Q0307-08.)

Under the Plan, once granted, short-term disability payments will continue until "the participant is certified by Health Services as able to return to work full-time or their current scheduled hours either with or without Medical Restrictions;" fifty-two or seventy-eight weeks have expired; the Participant fails to satisfy all eligibility requirements; the Participant receive excessive disability

income from other sources; or Plan coverage ends.   (A.R. Q0316.)

Since April 2004, all claims for benefits and appeals have been administered

by a third-party administrator, The Reed Group, working under the name "Qwest

Disability Services."  (Whitehurst Decl. ¶ 2.)

> The Third Party Administrator shall have the right and discretion to
> determine for all parties, all matters of fact or interpretation relating
> to the administration of Plan provisions, including questions of
> eligibility and any other matters.  The decisions rendered by the
> Third Party Administrator shall be conclusive and binding on all
> persons subject only to the right to appeal under the terms of this
> Plan.

(A.R. Q0358.)

If the Plan is unable to render a decision because of a claimant's failure to

submit the necessary information, the claimant shall receive a notice and have 45

days following the receipt of this notice to submit the necessary information.

(A.R. Q0360.)   On appeal, the following rules apply:

> The appeal shall be conducted by the Reviewing Party.  No member
> of the Reviewing Party may have been involved in the initial adverse
> benefit determination.  The Reviewing Party shall not afford
> deference to the initial determination, and shall take into account all
> comments, documents, records, and other information submitted by
> the Claimant relating to the claim, without regard to whether such
> information was submitted or considered in the initial determination.
> . . .  The Reviewing Party shall have full discretion to determine all
> matters of fact or interpretation relating to the appeal.

(A.R. Q0360.)

### 3.    Fiedor's Previous Medical History

4

In the past, Fiedor experienced a back condition that required multiple back surgeries, including multi-level lumbar fusion with placement of stabilization or Harrington rods.  (A.R. Q0010-11; Q0035.)  On June 30, 2001, Fiedor was in a car accident that aggravated her lower back condition, caused a neck injury with symptoms in her arms, and caused post-traumatic stress disorder with heightened depression.  (A.R. Q0037.)

Effective February 6, 2002, Qwest, through its third-party administrator, approved Fiedor's Family Medical Leave Act ("FMLA") request based on her medical conditions.  (A.R. Q0151-56.)  The approval was for leave for "intermittent incapacity" and for planned medical appointments.  (Id. Q0151.)

On April 27, 2002, an MRI revealed a minimal posterior disc bulging at the C6-7 level.  (A.R. Q0033-34.)

In April 2004, Fiedor's neurologist, Dr. Steven F. Noran, M.D., stated, "[Fiedor] is not missing work simply because she cannot.  They are very demanding of her time and it is difficult to get time off to do things."  (A.R. Q0072.)  Noran recommended that, because of her back condition, Fiedor only work overtime "at her discretion as her condition would permit."  (Id. Q0073.)

On June 21, 2004, Fiedor was involved in another car accident, which further aggravated her back condition.  (A.R. Q0064-65.)  On July 8, 2004, she told Noran that her symptoms had increased and it was "making it very difficult to

5

stay at work."  (Id.)

### 4.    Fiedor's Short-Term Disability Benefits Application

On July 19, 2004, Fiedor called Defendants by telephone and stated that she had been in an automobile accident approximately three weeks earlier and had injured her neck.  (A.R. Q0081.)  She requested short-term disability benefits.  (Id.)  She stated that her intended first day of absence ("FDA") was July 24, 2004.  (Id.)  Defendants provided the necessary forms to her and told her that she needed to provide medical information to support her disability claim no later than August 17, 2004.  (Id.)

On July 22, 2004, Fiedor told Defendants that she was changing her FDA to August 17, 2004.  (A.R. Q0082.)

On August 5, 2004, Fiedor visited Noran.  (A.R. Q0057-58.)

On September 7, 2004, Defendants received medical records from the Noran Clinic dated July 8, 2004; July 20, 2004; and August 5, 2004.  (A.R. Q0083.)   The July 8 report stated the following under the title "OBJECTIVE DATA:"

> The patient appears tired, depressed, and near tears, at times.  There is tenderness over the paraspinous cervical muscle, right greater than left.  Spasm is noted on the right side.  She has positive Spurling's sign on the right side.  Negative Tinel's and Phalen's sign on the right.  No autolyzing weakness is noted in the arms or legs.  She has a flattened lordotic curvature and spasm in the low back.  She has a scar from her old surgery.  There is acute tenderness over the sacroiliac joint on the right side and acute tenderness of the

> trochanteric bursa.  There is positive intertrochanteric band stretch
> test.  Straight leg raising causes low back pain only.  Motor, reflex,
> sensory, and cerebellar exams are otherwise unchanged.  There is no
> sign of myelopathy, at this time.

(A.R. Q0064-65.)  On that date, Fiedor told Noran that her symptoms had

increased and it was "making it very difficult to stay at work."  (Id. Q0064.)

Fiedor reported that she was not doing well before the accident, but was doing

worse since the accident and could not sit for prolonged periods because of hip

and low back pain.  (Id.)  Noran noted, "I have offered to take her off work and

get her into physical therapy, but, because of the company she works for, which is

Quest [sic] and the type of work that she does, she is afraid she would not be able

to take time off work or that she might jeopardize her employment."  (Id. Q0065.)

The MRI scan taken on July 20, 2004, showed minimal posterior disc

bulging at the C6-7 level, which was the same observation as during her previous

MRI on April 27, 2002.  (A.R. Q0102-03.)

Noran's August 5, 2004, report noted the following under the heading of

OBJECTIVE DATA:

> Ms. Fiedor's appearance remains essentially the same as last time.
> She has positive Tinel signs over the right median nerve now.  Her
> EMG really does not show an appreciable change from her last visit.  I
> have been able to personally review her cervical MRI scan.  It does
> not show any change from her previous scan of April 2, and it shows
> a C5-6 disc injury with disc bulge.  No neural impingement or
> Lhermitte's is noted.  No long tract findings are noted today.  Low
> back findings are still confined primarily to the low back with no
> findings of radiculopathy or nerve root irritation.

(A.R. Q0057.)  Noran concluded, "I think the patient should take a period of time off of work and do a few weeks of physical therapy and exercise. . . .  I have asked her to revisit us after she has completed her treatment.  This may not start until the middle of this month or so."  (Id.)

Defendants called Fiedor on September 7, 2004, the day they received her records from Noran, and told her that they would be denying her claim because there were no current objective medical findings since she had been out of work on short-term disability.  (A.R. Q0083.)  Fiedor told Defendants that her next visit with Noran was on September 17, 2004, but that she would try to get an earlier appointment.  (Id.)  Defendants told her that they needed objective findings from her neurologist or primary care physician in order to approve the short-term disability.  (Id.)

On that same day, Defendants notified Fiedor by letter that her claim for short-term disability benefits had been denied.  (Id. Q0095.)  The letter stated that the denial was based on the definition of disability under the Plan and on the Plan's requirements that she seek and follow proper care in a timely manner and that she provide objective documentation of her disability.  (Id.)  The letter quoted those portions of the Plan.  The letter also informed Fiedor of her right to appeal the benefits denial.  (Id. Q0096.)

Fiedor notes that the record contains another version of the denial letter

8

dated September 7, 2004, which acknowledged that Defendants received

objective medical documentation from Fiedor, but that it was insufficient to

substantiate disability.  (Id. Q0279.)  This letter stated that her claim was denied

because she "did not seek medical attention in a timely matter.  If your symptoms

are significant enough to prevent you from being at work, medical attention

should be sought during the first few days of your absence."  (Id.)  It also stated

that Defendants had received doctor's notes from July 8 and August 5 and an MRI

scan from July 20 indicating no change from April 2004, but had not received

"any current medical records with objective findings for your disability beginning

8/17/04."  (Id.)  This version also informed Fiedor of her right to appeal the

benefits denial.  Neither version informed Fiedor of her right to submit additional

medical information within 45 days of the denial.

Defendants then received a report that Fiedor saw Noran on September 10,

and, under the heading of OBJECTIVE, he stated:

> The patient appears worn out, depressed, has spasm in the
> paraspinous cervical muscles bilaterally.  50% reduction in range of
> motion of her neck.  No Lhermitte is noted.  Acute tenderness of the
> SIJs and trochanteric bursae to the point that she began crying.
> Positive intertrochanteric band stretch test.  Negative straight leg
> raining.  Patrick maneuver is limited bilaterally, mainly causing low
> back pain but on the right side initially caused groin pain.  I do not
> see any other evidence of neural impingement. . . .

(A.R. Q0055.)  Noran concluded, "I do not think she is capable of returning to

work at this point in time and I have given her a note for the same."  (Id.)

9

In a letter dated September 16, 2004, Fiedor appealed the denial of her benefits claim because "[t]he information I received during several phone conversations with Qwest Disability leads me to believe that your decision was based on incomplete information." (A.R. Q0053.)  She enclosed medical records to support her claim.  (Id.)  Defendants provided her with a summary of all of the medical information that Defendants had considered in assessing her eligibility for benefits and asked that Fiedor provide any additional information for the appeals board by October 12, 2004.  (Id. Q0104-05.)

Included in the new records Fiedor provided for her appeal was a report from Noran dated September 30.  This report was from a visit that included only "face-to-face consultation and education," and the report includes no objective findings.  Under the heading of SUBJECTIVE, Noran reported:

> Ms. Fiedor brings along her PT notes which show that she is making some gain.  She feels she is making gains.
>
> The reason she is back to seem [sic] is that she says her disability insurance company does not feel there is any reason for her to be on either short-term or long-term disability because there has been "no change."  I have told the patient I have no idea what the insurance company is talking about or what is going on but that in my opinion, the only thing we had not done to this time is given her an extended period of time off from work where she has to sit all day long, be connected to a phone and a computer and hopefully by a short period of disability, she will recover enough to be able to return to work.
>
> She has an appointment to revisit on October 22 and I am at this point in time not releasing her to return to work.  Obviously, she is

10

beginning to make some improvement and if she does not improve by
the time we see her in October, I think a chronic pain program will be
necessary as previously noted.

(A.R. Q0108.)

On October 13, Fiedor's claim was referred to Reed Review Services for an

"external review" of her appeal.  (A.R. Q0137.)  Defendants asked Reed Review

Services to determine if Fiedor was disabled and unable to work with or without

restrictions from August 24, 2004 through full-time return to work.  (Id.)

On October 20, 2004, Dr. Jacqueline Hess, an Internal and Occupational

Medicine specialist, conducted a review of Fiedor's medical history and benefits

claim for Defendants.  She issued a three-page report summarizing her findings.

(A.R. 0197-99.)  She listed, by date, the documents that she reviewed in issuing

her decision.  (Id. Q0198.)  She concluded, "No objective findings support the

need for Total Temporary Disability from sedentary work for this patient from

08/24/2004 through current."  (Id. Q0199.)  She reasoned that although Fiedor

"has multiple symptoms of headache, neck and arm pain, low back, hip and leg

pain . . . physical examination reveals only tenderness and decreased ROM.

Objective studies have revealed only a minimal cervical disc bulge and marginal

changes on EMG.  The patient has not had an FCE.  Medical records do not

support the need for Total Temporary Disability."  (Id.)

Fiedor asserts that there is no evidence that Hess considered the September

11

30 chart note as part of her review of Fiedor's appeal.  However, in Hess's list of

documents reviewed, she lists the chart notes by the date that they were signed

by Noran, rather than by the date of the exam, and the September 30 exam was

reported on a chart note signed on October 7.  Hess does list that she reviewed

chart notes from October 7, 2004.

On October 21, 2004, Defendants notified Fiedor by letter that her appeal

had been denied.  (A.R. Q0126.)   The letter stated that her case was initially

denied because she did not seek medical attention in a timely manner – the first

few days of her absence from work.  (Id. Q0127.)  It noted, "Although objective

medical information has been provided, it is insufficient to substantiate Disability

as there is no change in the medical records supporting that you are functionally

unable to work with or without restrictions as of August 17, 2004.  The cervical

MRI scan from July 20, 2004 indicated no change from the one completed on

April 27, 2004."  (Id.)  The letter also provided a summary of Hess's assessment.

After Defendants finally denied Fiedor's short-term disability claim, she

requested a medical leave of absence.  (A.R. Q0148.)  On December 20, 2004,

Defendants granted the unpaid leave of absence through December 28, 2004,

pending receipt of additional medical documentation to support her disability.

(A.R. Q0149-50.)  The letter stated that, if she did not provide additional

information from her provider by December 28, she must return to work by

12

December 29 or she would be terminated.  On December 15, 2004, Fiedor

provided additional medical records from the Noran Clinic, including visits on

October 29, 2004, and December 10, 2004.  (Id. Q0128-36.)  Fiedor's employment

was terminated in January 2005.

Effective February 2005, Fiedor was awarded Social Security Disability

benefits.  (Ex. A to Dunlop Aff.)

**B.    Procedural Background**

On September 7, 2005, Fiedor filed a Complaint against Qwest and the Plan

in this Court.  The Complaint alleges that by denying her claim for short-term

disability benefits, Defendants violated ERISA  §§ 502(a)(1)(B), 502(a)(3), and

510.

Defendants now move for summary judgment on all claims against them.

Fiedor also moves for summary judgment.  However, Fiedor did not address her

§ 510 claim in her briefs or at oral argument.  She requests that the Court declare

her eligible to receive short-term disability benefits from August 24, 2004,

forward, reinstate her eligibility to apply for long-term disability benefits, and

award her costs and attorney fees.

**III.   DISCUSSION**

**A.    Standard for Summary Judgment**

Summary judgment is appropriate if, viewing all facts in the light most

13

favorable to the non-moving party, there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking summary judgment bears the burden of showing that there is no disputed issue of material fact.  Celotex, 477 U.S. at 323.  Summary judgment is only appropriate when "there is no dispute of fact and where there exists only one conclusion." Crawford v. Runyon, 37 F.3d 1338, 1341 (8th Cir. 1994) (citation omitted).

**B.     Claims Under §§ 502(a)(1)(B) and 502(a)(3)**

ERISA § 502(a)(1)(B) provides that "a participant or beneficiary" may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B).

ERISA § 502(a)(3) provides:

A civil action may be brought--

* * *

by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan;

29 U.S.C. § 1132(a)(3).

**C.     Standard of Review of ERISA Plan Denial of Disability Benefits**

14

## 1.   General Standard of Review

Under ERISA, a plan beneficiary has the right to judicial review of a benefits determination.  <u>See</u> 29 U.S.C. § 1132(a)(1)(B).  When a policy provides the plan administrator with discretionary authority to determine eligibility for benefits, the abuse of discretion standard generally applies.  <u>Cash v. Wal-Mart Group Health Plan</u>, 107 F.3d 637, 641 (8th Cir. 1997).  In this case, the Plan provides Qwest and any third-party administrator with "full discretion and power" to "interpret the Plan," "determine the eligibility, status and rights of all persons under the Plan," and "review and grant or deny benefits claims and/or appeals under the Plan." (A.R. Q0357.)  Qwest also possesses the right to delegate this discretionary authority to any third-party administrator, and the undisputed evidence in the record is that it delegated its authority to The Reed Group.

Under the abuse of discretion standard, the plan administrator's decision to deny benefits must be affirmed if "a reasonable person <u>could</u> have reached a similar decision, given the evidence before him, not that a reasonable person <u>would</u> have reached that decision."  <u>Clapp v. Citibank, N.A. Disability Plan</u>, 262 F.3d 820, 828 (8th Cir. 2001) (emphasis in original) (quotation omitted).  Review of the administrator's decision is limited to the administrative record that was before the plan administrator at the time that the final benefits decision was made.  <u>Cash</u>, 107 F.3d at 642.  A decision is reasonable if it is supported by

substantial evidence, meaning "more than a scintilla but less than a preponderance." Clapp, 262 F.3d at 828 (citation omitted). A court "will not disturb a decision supported by a reasonable explanation even though a different reasonable interpretation could have been made." Id. (citation omitted).

A reviewing court will apply a less deferential standard of review, however, when a plaintiff presents "material, probative evidence demonstrating that (1) a palpable conflict of interest or a serious procedural irregularity existed, which (2) caused a serious breach of the plan administrator's fiduciary duty to her." Woo v. Deluxe Corp., 144 F.3d 1157, 1160 (8th Cir. 1998) (citation omitted). If the claimant meets both prongs of the Woo test, including a showing that the conflict or irregularity has "some connection to the substantive decision reached," the court will adjust the deference given to the decision of the plan administrator, depending on the seriousness of the conflict or irregularity. Id. at 1161-62.

### 2.   Analysis of Applicable Standard of Review

Defendants assert that the abuse of discretion standard applies because the Plan expressly grants Defendants discretion and Fiedor cannot meet the Woo test. Fiedor claims that Qwest operated under a palpable conflict of interest, which caused a serious breach of its fiduciary duty, or that serious procedural irregularities occurred.

### a.   First Prong of the Woo Test

16

### i.      Structural Conflict of Interest

Fiedor asserts that there is a palpable conflict of interest because Qwest self-funded the Plan and was also the plan administrator.  "As a general matter, when the insurer is also the plan administrator, we have recognized something akin to a rebuttable presumption of a palpable conflict of interest.  Indicia of bias can be negated by ameliorating circumstances, such as  equally compelling long-term business concerns that militate against improperly denying benefits despite the dual role."  Schatz v. Mut. of Omaha Ins. Co., 220 F.3d 944, 947-48 (8th Cir. 2000) (citations omitted).

Fiedor claims that the record is unclear regarding what involvement, if any, The Reed Group had in the initial decision to deny Fiedor's claim.  She claims that, as both the plan administrator and sponsor, Qwest recognized a direct savings by denying participants' claims, and, therefore, operated under a palpable conflict of interest when it decided to uphold its own initial decision to deny Fiedor benefits.

Defendants argue that there is no conflict of interest because Fiedor's employer, Qwest, is not both the plan administrator and the entity responsible for paying claims.  They argue that final decisions regarding benefits eligibility have been made by The Reed Group since April 2004.  Also, eligibility decisions are within the sole discretion of The Reed Group: Qwest has expressly delegated its

17

authority to make conclusive and binding determinations.  They argue that the
purpose of delegating benefits eligibility decisions to a third-party administrator is
to ensure that the decisions are made by an independent third party.

The Court concludes that Fiedor has not shown a structural conflict of
interest exists in this case.  Generally, if the sponsor completely delegates its
discretion to a third-party administrator, there is no conflict of interest, but if the
sponsor retains the authority to direct the benefits outcomes on particular claims,
even after delegation, or otherwise influences the third-party administrator's
decision-making process, then a conflict may still exist.  See, e.g., Atkins v. SBC
Commc'ns, Inc., 200 Fed. Appx. 766, 770-71 (10th Cir. 2006) (unpublished)
(holding that sliding scale standard does not apply when contract between
employer and third-party administrator specifically delegates authority to review
and process all short-term disability claims to third-party administrator and third
party administrator "has the power to make final and conclusive short-term
disability decisions"); accord Williams v. BellSouth Telecommc'ns, Inc., 373 F.3d
1132, 1135-36 (11th Cir. 2004).

In this case, Fiedor offers no evidence to contradict Defendants' evidence
that The Reed Group, not Qwest, administered Fiedor's claim.  Under the Plan
document, Qwest delegated claims decisions to The Reed Group:

> The Third Party Administrator shall have the right and discretion to
> determine for all parties, all matters of fact or interpretation relating

18

> to the administration of Plan provisions, including questions of
> eligibility and any other matters.  The decisions rendered by the
> Third Party Administrator shall be conclusive and binding on all
> persons subject only to the right to appeal under the terms of the
> Plan.

(A.R. Q0358.)   This is the type of absolute delegation that other courts have

found does not give rise to a structural conflict of interest.  There is no evidence

that The Reed Group had some other financial incentive to deny claims.  The

Court holds that there is no structural conflict of interest.

However, the Court must still examine whether Fiedor meets the first prong

of the Woo test due to the existence of procedural irregularities.

### ii.    Procedural Irregularities

Fiedor argues that Defendants committed serious procedural irregularities

in multiple ways.  The Court concludes that one of Fiedor's arguments prevails.

The Court concludes that Defendants committed a serious procedural

irregularity by failing to follow the Plan terms by denying Fiedor's claim on the

basis that she had not provided objective medical documentation without giving

her the required forty-five-day notice to provide additional objective evidence.

See Desrosiers v. Hartford Life & Accident Ins. Co., 456 F. Supp. 2d 325, 332

(D.R.I. 2006) ("A plan administrator's failure to follow its rules and internal

policies in a neutral and consistent manner is the essence of arbitrariness and

capriciousness.").  The failure to permit Fiedor time to provide additional

19

evidence was especially serious in this case because there was no evidence before

Defendants that Fiedor was not disabled: all of the evidence that she submitted

either supported her claim, such as the evidence from Noran, or was neutral, such

as the MRI.  Because Defendants' denial was based on lack of information, their

failure to follow Plan rules and allow Fiedor to submit additional information was

a serious procedural irregularity.

Because the Court has found that a procedural irregularity occurred, it must

now address the second prong of the <u>Woo</u> test.

### b.      Breach of Fiduciary Duty

To satisfy the second prong of the <u>Woo</u> test, Fiedor must show that the

procedural irregularity had a connection to the substantive decision made by the

plan.  Fiedor asserts that Hess did not point out any conflicting information in her

medical record or claim that anything in the medical records was inaccurate or

untrue.  Instead, Hess merely concluded that Fiedor's treating physician's

conclusion that she was disabled and could not return to work was not supported

because there were no objective findings to support her claim for disability.  She

argues that Defendants could have requested an independent medical

examination or a functional capacity evaluation, but chose not to.

As the Court previously concluded, Defendants committed a serious

procedural irregularity by failing to allow Fiedor additional time to submit

objective evidence of disability.  This irregularity had a connection to the decision

to deny her benefits because there was no evidence before the Plan that Fiedor

was not disabled.  Instead, the Plan received repeated opinions from Noran that

Fiedor needed to take time off of work in order to recover, but concluded that it

lacked current objective evidence of disability.  On appeal, Defendants again cited

no evidence contradicting Fiedor's disability claim, but, rather, relied on a

supposed lack of sufficient objective evidence of disability to deny her appeal.  See

Swintek-Hallinan v. UNUM Life Ins. Co. of Am., No. Civ. 04-1386JRTJSM, 2005

WL 1593051, at *3 (D. Minn. July 6, 2005) (unpublished) (holding that second

prong of Woo test met because, in absence of conflicting information in claimant's

medical record, "'missing' information [of specific restrictions or limitations by the

plaintiff's treating physicians] is not enough to overcome the extensive

documentation in [the plaintiff's] medical record of the pain, medical procedures,

medications, and therapies she has endured over the course of two decades").

Defendants committed a serious procedural irregularity by failing to inform

Fiedor that she had forty-five days to supplement her objective evidence and this

irregularity caused a breach of fiduciary duty because Defendants then rejected

her claim based on lack of objective evidence although there was no conflicting

evidence in her medical record.  The Court concludes that Fiedor has met both

prongs of the Woo test and will require that the record contain substantial

evidence bordering on a preponderance in order to support Defendants' denial of benefits.

### D.       Propriety of Defendants' Denial of Benefits

#### 1.       Abuse of Discretion Standard

The Court has concluded that it should review Defendants' denial of benefits under the much less deferential standard.  However, even under the abuse of discretion standard, the Court concludes that Fiedor is entitled to summary judgment.

Defendants argue that they did not abuse their discretion in denying Fiedor's claim because Noran's medical assessment of Fiedor is mixed and can be construed to support a finding that Fiedor is not disabled.  Defendants note that, as of June 2004, Fiedor was being treated for preexisting back conditions and that, despite these long-standing conditions, she was able to complete her regular work duties with the modification that she be excused from working mandatory overtime.  They argue that their decision is supported by the fact that Fiedor was in a car accident on June 21, 2004, but continued to work her regular duties at Qwest and did not see Noran until on July 8, 2004.  Noran did not report a change in the objective medical evidence of Fiedor's condition in August or September 2004.  Defendants note that the radiologist who performed an MRI of Fiedor's spine confirmed that there was no objective evidence of a change in her

22

previous condition apparent from the MRI.

Defendants also argue that Noran only recommended that Fiedor take work off for treatment, but did not explicitly conclude that she was physically incapable of performing her job duties with modification.  They assert that Noran noted possible modifications, such as restricted hours and workstation alterations, for Fiedor in a December 10, 2004, letter, completed after Fiedor's appeal was denied. However, in that document, Noran goes on to opine that "I doubt that she would be able to tolerate this despite any kind of alteration in workstation.  The work hours would obviously have to be significantly curtailed."  (A.R. Q0129.)  On September 27, 2004, Defendants informed Fiedor that modified job duties were available so that she would not have to sit all day.  (Id. Q0084.)

Defendants argue that based on the above evidence, Hess's opinion was well-founded.  They assert that Hess noted the lack of any appreciable change in Fiedor's objective medical evidence from her prior condition, with which Fiedor was able to work, and found a lack of objective evidence supporting a sudden inability to work after the second accident.  Thus, Hess opined that Fiedor's medical records fail to support that Fiedor was unable to perform her job duties in a modified capacity.  They assert that Hess acknowledged Fiedor's medical history and noted that the MRI and EMG examination after the second accident showed "no change" from Fiedor's previous exams.

The Court acknowledges that Defendants were "not obligated to accord special deference to the opinion of . . . the treating physician, over the conflicting opinion of . . . the reviewing physician." McGee v. Reliance Standard Life Ins. Co., 360 F.3d 921, 925 (8th Cir. 2004) (citation omitted).  However, Hess did not take issue with Noran's opinion, but merely opined that the record constituted insufficient evidence of disability because physical examination only revealed tenderness and decreased range of motion; objective studies showed a minimal cervical disc bulge and marginal changes on the EMG; and Fiedor had not had a functional capacity evaluation.  Hess's assessment of Fiedor's medical history is cursory and fails to make a credibility determination regarding Fiedor's reports of pain and disability.  Defendants did not request an functional capacity evaluation.

In July, August, and September 2004, Noran consistently referenced Fiedor's constant pain and opined that she remain off work in order to possibly improve.  Defendants cannot simply disregard Fiedor's own reports of her symptoms without doing their own exam or relying on credible contrary evidence. "[A] plan administrator may not deny benefits simply because a claimant cannot provide a diagnosis that would explain her self-reported symptoms.  . . .  [Also,] a plan administrator may not deny benefits simply because the only evidence of a disabling condition is subjective evidence." See Collins v. Cont'l Cas. Co., 87 Fed. Appx. 605, 606-07 (8th Cir. 2004) (unpublished) (citations omitted).

Furthermore, a plan should not rely on the opinion of its medical reviewer to deny a claim when treating physicians supported the claimant's claim and the reviewer "made no affirmative findings regarding [the claimant's] ability to function." Id. at 607.  Finally, if the plan chooses to ignore a claimant's subjective complaints, it should make a determination regarding her credibility.  Id. at 607-08.

In this case, in the absence of affirmative evidence that Fiedor could function, Defendants did not ask Fiedor to submit to an independent medical evaluation and summarily rejected all of her medical evidence.  Hess noted in her review that Fiedor had not completed a functional capacities evaluation, but Defendants did not ask Fiedor to complete that evaluation before denying her claim.  Thus, Defendants did not conduct an adequate review before denying her claim.

Moreover, Noran's opinion and Fiedor's medical records are clear that Fiedor's disability in the summer of 2004 was the result of an aggravation of a preexisting back condition.  There is no dispute that Fiedor had a long history of serious back and neck pain for which she had consistently sought treatment.  Her work duties had already been modified based on her condition.  The car accident in June 2004 exacerbated Fiedor's already serious condition.  The absence of a sudden, dramatic change in Fiedor's MRI or other objective tests is not sufficient evidence to deny her claim when she already dealt with a medical condition that

brought her near disability before her condition was aggravated.

The Court concludes that Defendants abused their discretion by denying

Fiedor's short-term disability claim by refusing to credit the medical evidence

submitted by Fiedor as legally sufficient evidence of disability while pointing to no

contrary evidence, rejecting Fiedor's subjective complaints while making no

determination regarding Fiedor's credibility, and requesting no additional

examination while relying, in part, on the absence of a functional capacity

evaluation.  See Norris v. Citibank, N.A. Disability Plan (501), 308 F.3d 880, 885

(8th Cir. 2002) (holding that administrator abused discretion by denying benefits

when "there is little, if any, evidence in the record from which a reasonable

person could find that [claimant] was not disabled under the terms of the Plan").

The Court holds that, based on the record that was before Defendants, Fiedor was

clearly entitled to an award of short-term disability benefits.

## 2.   Less Deferential Standard

Because the Court has concluded that Defendants' decision must be

reversed under the abuse of discretion standard, it follows that, under the

applicable standard requiring that the record contain substantial evidence

bordering on a preponderance in order to support Defendants' denial of benefits,

Defendants' decision must also be reversed.  Cf. Swintek-Hallinan v. UNUM Life

Ins. Co. of Am., No. Civ. 04-1386JRTJSM, 2005 WL 1593051, at *4 (D. Minn. July

6, 2005) (unpublished) (granting summary judgment, under same standard, for

claimant when claimant's "medical record is replete with evidence that she has

had difficulty working for years," and "documents a woman who has been

struggling with chronic back pain for almost two decades and whose condition

has steadily worsened over that period of time, until . . . she was unable to work at

all").

### E.      Fiedor's § 510 Claim, 29 U.S.C. § 1140

Fiedor did not address her § 510 claim in her briefs or at oral argument, so

Defendants' motion for summary judgment is unopposed with respect to this

claim.

Section 510 provides, in relevant part:

> It shall be unlawful for any person to discharge, fine, suspend, expel,
> discipline, or discriminate against a participant or beneficiary for
> exercising any right to which he is entitled under the provisions of an
> employee benefit plan, this subchapter, section 1201 of this title, or
> the Welfare and Pension Plans Disclosure Act [29 U.S.C.A. § 301 et
> seq.], or for the purpose of interfering with the attainment of any
> right to which such participant may become entitled under the plan,
> this subchapter, or the Welfare and Pension Plans Disclosure Act.

29 U.S.C. § 1140.

"Section 510 of ERISA makes it unlawful for an employer to discharge a

participant in an employee benefit plan for the purpose of interfering with the

attainment of any right to which such participant may become entitled under the

plan.  To prevail under § 510 [plaintiffs] must show that [the employer] had a

specific intent to interfere with their . . . benefits, but that may be shown by circumstantial evidence." <u>Register v. Honeywell Fed. Mfg. & Techs.</u>, LLC., 397 F.3d 1130, 1136-37 (8th Cir. 2005) (citations omitted).

Fiedor has not provided any evidence that Defendants discharged her or otherwise discriminated against her for the purpose of interfering with her rights under the Plan or ERISA.  Even her Complaint merely states that, by denying her short-term disability claim, Defendants interfered with her protected rights under Section 510 of ERISA (Compl. ¶ 17), but offers no specific allegations beyond the allegation that she was wrongfully denied short-term disability rights.  She points to no evidence that Defendants specifically intended to interfere with her ERISA rights.  The Court dismisses Fiedor's § 510 claim.

### F.    Attorney Fees and Costs

Although Fiedor requests attorney fees and costs, she did not address this issue in her memoranda or at oral argument.  If Fiedor seeks to have the Court examine a request for attorney fees, she must file a motion before the Court seeking them.

Accordingly, based upon the files, records, and proceedings herein, **IT IS HEREBY ORDERED**:

28

1.      Defendants' Motion for Summary Judgment [Docket No. 16] is **DENIED IN PART** and **GRANTED IN PART** as follows: Plaintiff's § 502(a)(1)(B) claim and her § 502(a)(3) **REMAIN** and Plaintiff's claim based on § 510 is **DISMISSED**.

2.      Plaintiff's Motion for Summary Judgment [Docket No. 19] is **GRANTED** as follows: Judgment is **GRANTED** for Plaintiff on her § 502(a)(1)(B) claim and her § 502(a)(3).  Fiedor is eligible to receive short-term disability benefits beginning August 24, 2004, and she is also eligible to apply for long-term disability benefits.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated:   July 24, 2007                              s / Michael J. Davis
                                                    Judge Michael J. Davis
                                                    United States District Court